**WEST CENTRAL GERMANTOWN NEIGHBORS, Ms. Susan Wright,**

v.

**ZONING BOARD OF ADJUSTMENT OF the CITY OF PHILADELPHIA and City of Philadelphia and Unitarian Universalist House of the Joseph Priestley District.**

**Appeal of Unitarian Universalist House of the Joseph Priestley District.**

Commonwealth Court of Pennsylvania.

Argued June 4, 2003.

Decided July 1, 2003.

Thomas P. Witt, Philadelphia, for appellant.

Cheryl L. Gaston, Ralph S. Pinkus, Philadelphia, for appellee.

BEFORE: PELLEGRINI, Judge, COHN, Judge, FLAHERTY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Unitarian Universalist House of the Joseph Priestley District (Property Owner) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court) reversing the decision of the Zoning Board of Adjustment of the City of Philadelphia (Board) granting its request for a variance to permit an expansion of a nursing home facility.

Property Owner is the owner and operator of a nursing home facility located at 224 West Tulpehocken Street in the Tulpehocken Station National Historical District of the City of Philadelphia (City) in an R 2 Residential Zoning District. The subject property contains a three-story mansion known as Priestley House which was constructed in 1880 and converted by Property Owner into a nursing home in 1932 as it has been operated since as a pre-existing, non-conforming use. The use was expanded in 1964 when a one-story addition was constructed and was further expanded in 1975 and 1987 to its present size. The facility, as a whole, now contains 26 assisted living rooms and 39 skilled care nursing rooms serving 65 residents. On September 25, 2001, Property Owner applied to the Department of License and Inspections for a permit to expand the nursing home facility from 37,195 square feet to 99,205 square feet, a 167% increase in square footage in order to serve approximately 100 residents, consisting of 39 skilled care nursing residents, 41 assisted living residents and 20 Alzheimer's residents.[1]

Finding that expansion of a non-conforming use could not exceed ten percent as of right; the proposed ten-foot side yard setback of the parking lot on the west end of the property was five feet less than the City requirement of 15 feet; the landscape buffer of the parking lot did not fully comply with the City's requirement; the height of the trash enclosure exceeded the maximum permitted; the maximum building coverage did not leave the required open area; and the proposed parking spaces did not meet the minimum area requirement for senior citizen facilities, the Department of Licenses and Inspections denied its request. Property Owner then appealed that determination to the Board

---

1. Property Owner requested permits to expand the facility on three previous occasions and was granted permits on two of those occasions.

seeking variances from the necessary requirements of the City's Zoning Ordinance as outlined by the Department of Licenses and Inspections.

Before the Board, Property Owner offered the testimony of its architect, Michael G. Hull (Hull), who described the proposed expansion stating that it would include constructing a new three-story addition to the original building, demolishing a one-story addition known as the Rush Wing that had been constructed in 1964 and developing 31 parking spaces where the Rush Wing had stood. Hull stated that merely modernizing the Rush Wing to deal with the needs of the facility was not a viable option because that addition had many physical problems and existed only on waivers from the Pennsylvania Department of Health, and there was no where to move the residents living in that portion of the facility in order to demolish that addition and construct a new addition in its footprint. Hull further testified that the proposed expansion, i.e., a facility to serve 100 residents, was the smallest viable option in order to ensure that the facility could continue operation. He also stated that even after the expansion, the facility would continue to be one of the smallest facilities in the area.

Also in support of its request, Property Owner offered the testimony of Pat Hughes (Hughes), the President of its Board, who testified that during the planning of the proposed expansion, Property Owner retained the services of project consultants and, based upon those reports, it was clear that Property Owner had to increase the resident accommodations at the facility in order to meet the needs of the residents and to compete in the marketplace. He testified that the purpose of the expansion was to provide more up-to-date care for an increasingly frail elderly population. Hughes stated that he believed the facility could not survive in the long-term without the expansion and that the proposed expansion was the smallest feasible expansion available.[2]

In opposition to Property Owner's request for a variance, West Central Germantown Neighbors and Susan Wright (collectively, Objectors) offered the testimony of numerous property owners in the neighborhood.[3] Objectors testified that while they understood Property Owner's need to enlarge the facility in order to remain economically viable, they believed that the enormity of the proposed expansion, as well as the specific placement of the addition, would be detrimental to and alter the character of the neighborhood. Specifically, David Plant, president of the West Central Germantown Neighbors and a site design engineer, testified that the proximity of the large addition to the surrounding houses, the demolition of the caretaker's cottage, and the destruction of the surrounding gardens was detrimental to the overall character of the neighborhood. He further stated that the proposed scale of the addition, making the facility approximately 20 times the size of the adjacent building, was not compatible with the neighborhood. Objectors further not-

2. Property Owner also offered the testimony of Greg Winkler, project manager for Becker and Frondorf Project Management and Cost Consulting, who stated that the area surrounding the facility contained many uses other than single-family homes.

3. Objectors also submitted a petition with approximately 60 signatures of individuals in the area opposing the variance request and stating that "[w]e object to the plans submitted to you by the Unitarian Universalist House, 29 W. Tulpehocken St. 19144.ʼ We do not want any expansion beyond the current footprint as it now stands. We object to the further encroachment of UUH on the Maxwell Mansion Museum." (R.R. at 447a).

ed that the proposed expansion violated several provisions of the City's Code, including setbacks and coverage requirements.

Objectors also offered the testimony of George Ritter, a landscape architect and partner of David Plant, who testified that the plan Property Owner sought to undertake was an attempt to redefine the market area for the facility and to expand that market area. He stated that not only was the facility seeking to increase the number of beds from approximately 60 to 100, a 53% increase in the occupancy of the structure, but it was also seeking to treat or provide facilities for different types of patients, i.e., those with Alzheimer's or Parkinson's, thereby changing the type of use of the structure.

Finding that the nursing home facility would not be viable and would be forced to abandon the subject property unless it could modernize and expand its capacity to compete in the present marketplace, that it was the smallest nursing home facility in its market area and would continue to be the smallest facility in its market area, even with the proposed addition, and that there was no evidence in the record that the proposed addition would affect the public health, safety or welfare, the Board granted Property Owner's request for a variance, provided that the proposed changes met the City's fire code and provided for commercial trash pick up and air conditioning. Objecting to the grant of the variance to Property Owner, Objectors filed a timely appeal with the trial court.

 Taking no additional evidence, the trial court concluded that Property Owner failed to meet the criteria for a variance

because the only reason it offered for needing the variance was economics, i.e., that the changing times have made its facility obsolete. It concluded that because there was no evidence of any hardship based on the uniqueness of the building or property that would warrant granting a variance, the Board abused its discretion in granting the variance and reversed that determination. This appeal by Property Owner followed.[4]

Property Owner contends that the Board did not abuse its discretion or commit an error of law in granting its request for a variance because the addition to the existing structure it seeks to make are necessary for the natural expansion of the pre-existing non-conforming use and do not detrimentally impact the public health, safety or welfare. It argues that because the nursing home facility will not be viable and it will be forced to abandon the property if it is not able to modernize and expand the facility to compete in the present place market, the proposed expansion is the minimal amount necessary to allow the facility to compete and there was sufficient evidence presented before the Board that the proposed expansion would not adversely affect public health, safety or welfare, it is entitled to relief in the nature of a variance.

 Initially, we recognize that the right to expand a non-conforming use to provide for natural expansion and accommodation of increased trade is a constitutional right protected by the due process clause. *Silver v. Zoning Board of Adjustment,* 435 Pa. 99, 255 A.2d 506 (1969). While a municipality cannot prohibit, *per se,* the natural expansion of a non-conform-

---

4. In a zoning appeal where the trial court takes no additional evidence, our scope of review is limited to determining whether the zoning hearing board manifestly abused its discretion or committed an error of law. *Tu-*

*Way Tower Company v. Zoning Hearing Board of the Township of Salisbury,* 688 A.2d 744 (Pa.Cmwlth.1997). A zoning hearing board abuses its discretion when its findings are not supported by substantial evidence. *Id.*

ing use, the right of the expansion of a non-conforming use is not unlimited. The expansion must not be detrimental to the public health, safety or welfare and a municipality is afforded the right to impose reasonable restrictions on such an expansion. *Id.*

The City of Philadelphia allows for the natural expansion of a non-conforming use; however, it has imposed restrictions on the extent of any such expansion. Section 14–104(7) of the Philadelphia Code provides, in relevant part:

No structural extensions or additions to a structure containing a non-conforming use shall be made after July 15, 1957, which, when added to all structural extensions and additions made since the use first began to be non-conforming, shall cause the aggregate floor area of all such structural extensions and additions to exceed 10% of the gross floor area of the structure when the use first began to be non-conforming[.]

 Where the owner of a non-conforming use seeks to expand that use and that expansion conflicts with restrictions in the zoning ordinance, the property owner is required to seek a variance. *Jenkintown Towing Service v. Zoning Hearing Board of Upper Moreland Township,* 67 Pa.Cmwlth. 183, 446 A.2d 716 (1982). To obtain relief in the nature of a variance as applied to a pre-existing non-conforming use, an applicant must establish four factors: (1) that an unnecessary hardship exists which is not created by the applicant and which is caused by unique physical circumstances of the property for which the variance is sought; (2) that a variance is needed to enable the party's reasonable use of the property; (3) that the variance will not alter the essential character of the district or neighborhood, or substantially or permanently impair the use or development of the adjacent property such that it

is detrimental to the public's welfare; and (4) that the variance will afford the least intrusive solution. *Larsen v. Zoning Board of Adjustment,* 543 Pa. 415, 672 A.2d 286 (1996).

 In support of its argument, Property Owner relies heavily on this Court's decision in *Jenkintown* and our more recent decision in *Domeisen v. Zoning Hearing Board of O'Hara Township,* 814 A.2d 851 (Pa.Cmwlth.2003). In *Jenkintown,* the property owner owned and operated a business of vehicle towing and repair as a non-conforming use in a C 1 commercial zoning district. In order to accommodate its expanded business, the property owner requested a variance to permit the construction of an addition to its existing two-story building, which would enclose a site that had been used for truck repair. Because the proposed expansion did not conform to the municipality's requirements for a minimum side yard of 30 feet or the limitation on the expansion of a non-conforming use to 25% of its building area, as calculated at the time the use became non-conforming, the property owner applied for variances. The zoning hearing board denied the variances and the property owner appealed to the trial court which remanded the matter for additional testimony on the hardships alleged by the property owner. The zoning hearing board again denied the variances and on appeal, the trial court reversed that decision and granted the variances.

On appeal, this Court discussed at length the issues surrounding the expansion of a non-conforming use and the application of variance requirements to that request. Concluding that the property owner's testimony that continued use of the present building for certain work and the practical difficulty of pursuing that work outdoors was sufficient to establish an unnecessary hardship, and that there

would be no detriment to the public health, safety and welfare, and, in fact, the public interest would be benefited rather than harmed by enclosing the work which was already being done in the open, we affirmed the trial court.

In *Domeisen*, the property owner was a family-owned landscaping business operating on a 12–acre lot in O'Hara Township, existing as a pre-existing non-conforming use in an R–2 suburban residential zoning district. In 2000, the property owner applied for a special exception and related variances in order to expand the pre-existing non-conforming use and seeking to increase the floor area in excess of the 25% allowed under the zoning ordinance by 129%, resulting in a 2.4% increase in building coverage resulting in a total building coverage of 4.2%. Before the zoning hearing board, the property owner alleged that the expansion was necessary in order to keep the business viable and that the requested expansion was the smallest expansion needed to maintain the business. Finding that the expansion would be in keeping with the nature and character of the community and the goals of the zoning ordinance, that the property could not be expanded within the limits of the zoning ordinance and that the expansion would permit the property owner to carry on its business while maintaining the right of the township to limit future expansion, the zoning hearing board granted the special exception and variances. Individual neighbors appealed to the trial court which concluded that the proposal was a natural expansion of a non-conforming use and affirmed the zoning hearing board's decision.

On appeal to this Court, we concluded that the variance requested was necessary to allow the property owner's business to remain financially viable and was the minimum that would serve that purpose, and that the proposed expansion would not be detrimental to the public welfare, especially where the subject property sat on a busy state highway and a nearby church and school already generated traffic. Based on those factors, we held that the property owner was entitled to a variance.

While those cases involved substantial expansions of non-conforming uses, that, however, does not mean that a property owner is automatically entitled to an unlimited expansion of a non-conforming use. What those cases indicate is that in determining whether a variance is to be granted, what has to be taken into consideration are all of the factors, including the magnitude of the expansion of the non-conforming use as it relates to the zoning lot and its relationship to adjacent structures, as well as the surrounding neighborhood. Also to be considered is whether the expansion is otherwise in conformity with the applicable dimensional zoning requirements. While both *Jenkintown* and *Domeisen* sustained variances for substantial expansions of non-conforming uses, a comparison of those cases to this case illustrates that variances were sustained against different factual backgrounds.

In *Jenkintown*, the subject property was located in a C 1 commercial district, involved only closing in an area that was already being used as part of the business, and actually benefited the public interest by enclosing the work that had been being done in the open. In comparison, in this case, the property is located in an R–2 residential district, and is part of a national historic district within the City, the proposed expansion would require the destruction of gardens and open space in order to construct a building to house a nursing facility which has not been previously used for that purpose. Additionally, land area that has previously been covered with an addition which is being torn down

as part of the proposed expansion is then going to be turned into a 31 space parking lot.

As to *Domeisen*, in that case, the subject property was a 12 acre lot located in an R 2 Suburban Residential District, and while the property owner there requested relief to expand its floor area by 129%, in excess of the 25% zoning ordinance limitation, the proposal would have only resulted in a 2.4% increase in building coverage. Additionally, the subject property was located on a busy state highway in close proximity to other intensive uses. In this case, the subject property is a 2.15 acre lot located in a national historical district, Property Owner seeks to expand its facility by 167%, a building over two-and-one-half times the size of the existing structure, and well beyond the 10% limitation on expansion of non-conforming uses in the Philadelphia Code. Additionally, the proposed expansion would provide only 63% of open area where a minimum requirement of 70% exists.

Utilizing the multi-factor test noted above to determine whether relief in the nature of a variance is appropriate where the owner of a pre-existing non-conforming use seeks to expand that use, we must balance the rights of the property owner against the effect such an expansion would have on the surrounding area. *See Silver.* In this case, while it seems neither of the parties dispute the fact that Property Owner's nursing facility is out-dated and in danger of being unable to compete in today's market, that factor alone does not entitle Property Owner to a variance. *See*

*O'Neill v. Zoning Board of Adjustment of Philadelphia County*, 434 Pa. 331, 254 A.2d 12 (1969) (a variance will not be granted solely because the applicant will suffer an economic hardship if he does not receive one).

Property Owner, here, seeks to expand its nursing facility from its current facility, which is 37,195 square feet serving 65 assisted living and skilled care residents to a facility of 99,205 square feet approximately two-and-one-half times the size of the existing building which would serve 100 residents including assisted living, skilled care and Alzheimer's residents. Rather than the 10% expansion that the zoning ordinance permits, Property Owner seeks to expand its non-conforming use by 167%,[5] a staggering increase given the location of the non-conforming use in a national historic district within the City and the uses of the properties in the immediate vicinity of Property Owner's facility. If we were to allow the proposed expansion, such an absurd result would render the expansion provision of the City's Code as mere surplusage and would eviscerate the very purpose of the prohibition. In ascertaining the intention of a law-making body, we presume that the law-making body did not intend a result that is absurd. *Appeal of Dillon Real Estate Co., Inc.*, 688 A.2d 1264 (Pa.Cmwlth.1997); Section 1922(1) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1922(1).

Additionally, Property Owner's proposal fails to comply with the City's requirements for setbacks, buffer areas and maximum building coverage, meaning that vari-

---

**5.** Property Owner's expansion is actually in excess of 167% because that increase is calculated on the size of the existing facility being 37,195 square feet, which includes the addition to the facility which was added in 1964 and expanded in 1975 and 1987. Section 14–104(7) of the City's Code, however, provides that the calculation of an increase in the floor area of a non-conforming use must be calculated as of the date when the use first began to be non-conforming, in this case, prior to the 1964 addition. Therefore, the floor area of the addition known as the Rush Wing should not be included in the facility's floor area to determine what percentage of increase in floor area is proposed.

ances from those requirements would also be needed in order to accommodate the expansion. In effect, Property Owner is asking for more than a permitted use would have.[6]

Accordingly, based on the foregoing, we conclude that the Zoning Board abused its discretion in granting Property Owner's request for a variance and the order of the trial court is affirmed.

### ORDER

AND NOW, this 1st day of July, 2003, the order of the Court of Common Pleas of Philadelphia County, April Term, 2002 No. 1262, dated November 8, 2002, is affirmed.

---

**6.** Moreover, while the Board concluded "there is no evidence in the record that the proposed addition will effect [sic] the public welfare safety or health. In fact, protestants state that they do not object to the proposed addition, only the manner and location of its placement on the subject property," (Findings of Fact and Conclusions of Law of the Zoning Board, dated August 12, 2002, at 7), that conclusion ignores the testimony of 12 individuals, including that of witnesses, whose professions include site design engineer, landscape architect and historic preservation consultant presented by Objectors. Objectors collectively presented concerns regarding the magnitude of the expansion and the new building's proximity to surrounding historic buildings, the destruction of gardens and open space, the effect of the construction on light and air encroachment and the addition's overall adverse impact on the character of the neighborhood.